**BORMAN'S, INC., Plaintiff,**

v.

**MICHIGAN PROPERTY AND CASUALTY GUARANTY ASSOCIATION, Defendant.**

**No. 86–CV–70122–DT.**

United States District Court, E.D. Michigan.

June 30, 1989.

Stephen Glazek, Elaine Fieldman, Detroit, Mich., for plaintiff.

Jeffrey Lipshaw, Donald S. Young, Detroit, Mich., for defendant.

## OPINION

HACKETT, District Judge.

Plaintiff Borman's, Inc. (Borman's), is a Delaware corporation authorized to do business in the State of Michigan. Its principal place of business is located in the City of Detroit. Borman's is the owner and operator of the Farmer Jack Supermarkets chain. At the time the complaint was filed, there were more than 80 Farmer Jack stores located in the State of Michigan. Borman's also owns and operates certain subsidiaries and divisions involved in the manufacture and distribution of food products.

Defendant Michigan Property and Casualty Guaranty Association (Association) is a Michigan association created under the Michigan Property & Casualty Association Act (Act), M.C.L. § 500.7901, *et seq*. With limited exceptions, all insurers authorized to transact insurance in Michigan must be members of the Association. When a member insurer becomes insolvent, the Association steps into the insurer's shoes. The Association has the right to appear and defend claims, and the obligation to pay and discharge "covered claims." M.C.L. § 500.7931.

It is plaintiff's position that section 500.-7925(3) of the Act, which denies reimbursement of claims filed by "... a person who has a net worth greater than 1/10 of 1% of the aggregate premiums written by member insurers in this state in the preceding calendar year," denies plaintiff its right to equal protection under the law as guaranteed by the fourteenth amendment to the United States Constitution and by article I, section 2, of the Michigan Constitution. For the reasons set forth below, the court agrees with plaintiff's position and finds that the means chosen to identify claimants entitled to reimbursement under the Act, that is, solely on the criterion of the claimant's net worth, is not rationally related to the legislative purpose of allocating loss to those best able to absorb loss. Therefore, the court determines that section 500.-7925(3) of the Act violates plaintiff's right to equal protection under the law as guaranteed by both the United States and Michigan Constitutions.[1]

*The Act*

The Act provides:

To implement this chapter, there shall be maintained within this state, by all insurers authorized to transact in this state insurance other than life or disability insurance ... an association of those insurers to be known as the property and casualty guaranty association, hereafter referred to as the "association". Each insurer shall be a member of the association, as a condition of its authority to continue to transact insurance in this state.

M.C.L. § 500.7911(1). The Association is managed by a board of governors comprised of five member insurers and two persons from the general public. M.C.L. § 500.7912.

The Association's costs for administration, claims, and defense are paid for by an assessment levied on the member insurers:

To the extent necessary to secure funds for the association for payment of covered claims and for payment of reasonable costs of administering the association, including the cost of indemnifying members of the board of governors, other

---

1. Plaintiff also takes the position that application of the formula contained in section 500.-7925(3) of the Act constitutes a denial of due process under the United States and Michigan Constitutions. Having found that plaintiff's right to equal protection under the laws has been violated by section 500.7925(3), the court finds it unnecessary to address plaintiff's due process argument.

member insurers, officers, employees, and other persons acting on behalf of the association to the extent permitted by law and the plan of the operation, the association shall levy assessments upon all member insurers. The association shall allocate its claim payments and costs to the following 5 categories:

(a) Worker's compensation insurance.

(b) Automobile insurance.

(c) Title insurance.

(d) Fire, allied lines, farm owner's multiple peril, homeowner's multiple peril, inland marine, earthquake and credit insurance.

(e) All other kinds of insurance except life and disability insurance.

M.C.L. § 500.7941(1). Under the Act, assessments are charged per category and may only be used to pay for claims and costs associated with that particular category:

Separate assessments shall be made for each category prescribed in subsection (1) [M.C.L. § 500.7941(1)]. The assessments for each category shall be used to pay the claim payments and costs allocated to that category. The assessment for each category shall be in proportion to the net direct premiums written, after deducting dividends paid or credited to policy holders, by each member insurer in this state for kinds of insurance included within each category, as reported in the most recent annual statement available at the time of assessment. The rate of assessment shall be a uniform percentage of the premiums for all member insurers. The assessments shall be remitted to and administered by the association in accordance with the plan of operation. Each member insurer assessed shall have not less than 30 days' advance written notice of the date the assessment is due and payable.

M.C.L. § 500.7941(2). As provided by the Act, member insurers may pass the cost of such assessments to their insureds as part of the premiums, and thus *the funds needed by the Association to pay claims are paid by the insureds to the extent the assessments are included in the rates.*

Insureds who pay more premiums thus pay more assessment dollars. M.C.L. § 500.7941(4).

The Act provides that in order for a claim to be a "covered claim," it must arise out of a policy of an insolvent member insurer, and must be issued to a Michigan resident or payable to a Michigan resident:

"Covered claims" means obligations of an insolvent insurer which meet all of the following requirements:

(a) Arise out of the insurance policy contracts of the insolvent insurer issued to residents of this state or are payable to residents of this state on behalf of insureds of the insolvent insurer.

(b) Were unpaid by the insolvent insurer.

(c) Are presented as a claim to the receiver in this state or the association on or before the last date fixed for the filing of claims in the domiciliary delinquency proceedings.

(d) Were incurred or existed before, at the time of, or within 30 days after the date the receiver was appointed.

(e) Arise out of policy contracts of the insolvent insurer issued for all kinds of insurance except life and disability insurance.

(f) Arise out of insurance policy contracts issued on or before the last date on which the insolvent insurer was a member insurer.

M.C.L. § 500.7925(1). The amount of a covered claim is limited to the amount of coverage afforded under the policy and the maximum claim limit described in the Act. M.C.L. § 500.7925(4)(5).

Under the Act, persons and entities who have a net worth in excess of a statutory formula cannot recover from the fund:

Covered claims shall not include obligations to an insurer, insurance pool, underwriting association, or to a person who has *a net worth greater than ¹/₁₀ of 1% of the aggregate premiums written by member insurers* in this state in the preceding calendar year.

M.C.L. § 500.7925(3) (emphasis added). Net worth is not defined in the Act. Bor-

man's has challenged the constitutionality of section 500.7925(3). Borman's asserts that because there is no rational relationship between an insured's net worth and the insured's ability to absorb loss, Section 500.7925(3) violates the equal protection clauses of the United States and Michigan Constitutions.

*Background*

At trial, the Association offered the testimony of Elijah Poxson. Poxson was employed by Michigan Mutual Insurance Company (Michigan Mutual) from 1941 until 1977, at which time he took an early retirement. In 1969, he was General Counsel for Michigan Mutual and subsequently became Vice–President and Secretary. From 1974–1977, Poxson was the President of Michigan Mutual. During much of his employment with Michigan Mutual, Poxson participated in the American Mutual Insurance Alliance, a national trade association for insurance carriers (Trade Association). The Trade Association monitors legislation, attempts to affect the course of legislation, and participates as amicus curiae in litigation affecting the insurance industry.

Poxson testified that in the late 1960's the question of guaranty association legislation was discussed during Trade Association meetings. According to Poxson, certain federal legislation had been proposed which the insurance industry did not want enacted. In an effort to thwart such federal legislation, the Trade Association formed a sub-committee sometime in 1968, of which Poxson was a member, to draft a proposed model bill for state regulated post-assessment guaranty associations. The sub-committee drafted a proposed bill which was approved by the Trade Association. The proposed Trade Association model bill provided for a net worth limitation of $1 million, and provided for a maximum assessment on member insurers of 1% of net direct annual premiums written. The Trade Association bill was presented to and rejected by the National Association of Insurance Commissioners (NAIC). The model act ultimately accepted by the NAIC contained no net worth limitation, and contained a maximum assessment of 2% of net direct annual premiums written.

At the State level, on April 15, 1969, House Bill No. 3699 was introduced in the Michigan legislature. This was the original version of the bill that eventually became the Michigan Property & Casualty Association Act. House Bill No. 3699 did not contain a net worth limitation. Between April of 1969 (original bill) and May of 1969 (when a substitute bill was introduced), Poxson was asked to sit on a General Counsels' Committee to review the pending bill. The committee consisted of approximately five general counsels of major insurance companies and an actuary from the Michigan Insurance Bureau. Poxson reviewed House Bill No. 3699 but, according to his testimony, did not find it to his liking. He then obtained a copy of the model bill that the Trade Association sub-committee had drafted, and gave it to the actuary sitting on the General Counsels' Committee to be used as a substitute bill for presentation to the Michigan legislature. The Trade Association model bill was discussed at the meetings of the General Counsels' Committee. Poxson could not recall any specific committee discussion of the net worth provision, but he did state that the committee members agreed that a net worth limitation should be included. He recalled that the commission had considered looking solely at assets as a means to determine a person's ability to absorb loss, but that that option was rejected. Poxson stated that there was no discussion as to the meaning of the term net worth, its application or rationale, or whether net worth was indicative of financial condition. Poxson recalled that it was the committee actuary that devised the formula which caused the net worth limit to fluctuate based on premiums written by member insurers. He also recalled a comment, at one point, that "nobody feels sorry for General Motors."

Poxson, as general counsel for Michigan Mutual, testified that during committee discussions he was concerned about the impact of the assessment on Michigan Mutual and therefore wanted to limit the assessment to 1% of net direct premiums. The

proposed model bill submitted to the NAIC by the Trade Association, which bill had been obtained by Poxson, was modified to include a net worth limitation based on $\frac{1}{10}$th of 1% of net direct premiums, and a maximum annual assessment of 1% of net direct premiums. This bill was introduced in the Michigan legislature as a substitute bill with some minor changes on May 2, 1969, and was enacted and became law on August 11, 1969. There was no testimony or evidence introduced in court concerning discussions by any committee or by the legislature regarding the net worth limitation, other than the above described testimony of Poxson.

The parties agree that the net direct premiums written in the state, net worth limitation, and maximum covered claims under the Act for the years 1977–1987 were:

| Year | Premiums Written | Net Worth Limit | Maximum Claim |
|------|------------------|-----------------|---------------|
| 1977 | $3,330,832,000 | $3,330,832 | $1,665,416 |
| 1978 | $3,913,666,000 | $3,913,666 | $1,956,833 |
| 1979 | $4,326,290,000 | $4,326,290 | $2,163,145 |
| 1980 | $4,323,174,000 | $4,323,174 | $2,161,587 |
| 1981 | $4,205,984,000 | $4,205,984 | $2,101,992 |
| 1982 | $4,041,943,000 | $4,041,943 | $2,020,972 |
| 1983 | $4,207,312,000 | $4,207,312 | $2,103,656 |
| 1984 | $4,696,500,000 | $4,696,500 | $2,348,250 |
| 1985 | $5,820,973,000 | $5,820,973 | $2,910,487 |
| 1986 | $7,262,697,000 | $7,262,697 | $3,631,349 |
| 1987 | $7,676,669,000 | $7,676,669 | $3,838,335 |

The parties agree that the net worth of Borman's, as of the end of the fiscal years ending January, 1980, through January, 1988, was:

| | |
|---|---|
| Y/E January 26, 1980 | $32,557,000 |
| Y/E January 31, 1981 | $32,006,000 |
| Y/E January 30, 1982 | $28,262,000 |
| Y/E January 29, 1983 | $35,304,000 |
| Y/E January 28, 1984 | $23,901,000 |
| Y/E January 26, 1985 | $22,797,000 |
| Y/E January 25, 1986 | $30,135,000 |
| Y/E January 31, 1987 | $38,783,000 |
| Y/E January 30, 1988 | $10,110,000 |
| 3rd Qtr. Nov 5, 1988 | ($ 870,680) |

The parties agree that for the period May 1, 1980, to May 1, 1984, Borman's primary general liability and auto insurance carrier was Ideal Mutual Insurance Company (Ideal), a New York company. Each of the policies which Ideal issued to Borman's had a combined single limit of $950,000 per occurrence, in excess of $50,-000 per occurrence retained limit. Accord-

ing to trial testimony, Borman's purchased the Ideal insurance through Marsh and McLennan, identified as one of the largest insurance brokers in the country.

On February 7, 1985, the Supreme Court for the State of New York, County of New York, entered an order in a case entitled *In the Matter of the Application of James P. Corcoran, as Superintendent of Insurance of the State of New York, for an Order to Take Possession and Liquidate the Business and Affairs of Ideal Mutual Insurance Company,* Index No. 40275–85. The order stated that Borman's insurer, Ideal, was insolvent. The order appointed the New York Superintendent of Insurance as liquidator of Ideal to forthwith take possession of Ideal's property and liquidate the business and affairs of Ideal under the Uniform Insurer's Liquidation Act, as adopted in New York.

Ideal was a "member insurer" of the Michigan Property & Casualty Guarantee Association and an "insolvent insurer" as defined in the Act. M.C.L. § 500.7921. On March 25, 1985, the Michigan Commissioner of Insurance was appointed Ancillary Receiver of Ideal.

On August 7, 1981, Norris Frye had filed a complaint against Borman's in the Wayne County Circuit Court, State of Michigan, alleging damages arising out of a slip and fall which occurred at a Farmer Jack Store during August of 1980. The case proceeded through discovery and trial. On September 24, 1984, the Wayne County Circuit Court entered a judgment on a jury verdict against Borman's for $1.5 million plus interest of $638,569.00.

The Frye judgment against Borman's was covered under the Ideal policy. Subsequent to entry of the judgment, Ideal agreed to pay a minimum of $950,000 towards settlement of the Frye judgment. However, on December 26, 1984, the New York Supreme Court entered an order of rehabilitation. The order of rehabilitation and subsequent order of liquidation (entered on February 7, 1985) enjoined disposition of Ideal's property and enjoined further prosecution of any action. As a result of Ideal's failure to pay its share of the

agreed settlement of the Frye judgment, Borman's was required to contribute approximately one million dollars toward settlement of the Frye matter.

The Michigan Commissioner of Insurance, as Ancillary Receiver of Ideal, sent a notice to all Ideal policyholders and claimants in Michigan notifying them that all claims under the Act must be filed by February 7, 1986. Borman's filed a timely claim regarding the Frye judgment.

The Association declined to honor Borman's claim, however, based on the determination that Borman's net worth exceeded the statutory formula on the date of the liquidation order. M.C.L. § 500.7925(3).

*The Proofs*

The Michigan Insurance Bureau monitors the financial condition of insurance companies doing business in Michigan. During trial, the testimony of Jacqueline Reese was introduced. Reese is an auditor employed by the Department of Licensing and Regulation, Insurance Bureau, Financial Analyst Division, and she was the auditor in charge of the Ideal account during the years in question. During her testimony, Reese stated that the function of the auditors is to audit the financial statements of insurance companies in order to determine their financial solvency. The goal is to insure financial solvency of insurance companies for Michigan policyholders and residents. The aim of the financial analyst division is to prevent further injury to Michigan policyholders and residents by placing restrictions on companies which are in financial difficulty. These restrictions might include: premium limitations, policy limitations, suspension of writing policies, and cease and desist orders. Reese audited Ideal's financial information on a quarterly and annual basis from 1980 through its insolvency. Reese was satisfied that Ideal was not a risk to the public based on its 1980, 1981, and 1982 financial information, and the follow-up information that Reese requested from Ideal. Reese did not recommend imposing any restrictions on Ideal until 1984. She was of the opinion that Ideal was not in any financial difficulty until the 1983 year-end information was audited during the first quarter of 1984. According to Reese, the first time the Insurance Bureau informed Ideal that it was considering imposing restrictions was mid–1984, and the first time that the Insurance Bureau imposed restrictions on Ideal was August 17, 1984. The restrictions issued against Ideal in August, 1984, included a prohibition against the writing of new business without prior written approval by the Bureau and the requirement of a special deposit. The August, 1984, restrictions were informal agreements and were not communicated to the public.

According to the testimony of Lawrence Sullivan, president of a risk management services company, the *Best's Key Rating Guide (Best's)*, published by A.M. Best Company, was the most commonly used source in the insurance industry for rating the financial stability of insurance companies during the time period in question. Sullivan stated that it was reasonable for insureds and insurance brokers to rely on *Best's* in choosing insurance companies and also to rely on the grant of a license by the state insurance regulators.

Ideal was rated as follows by *Best's:*

| | |
|---|---|
| 1980 | B+ |
| 1981 | A |
| 1982 | A |
| 1983 | Contingent A |

*Best's* defines a B+ as: very good—assigned to those companies which have achieved very good overall performance when compared to the norms of the property-casualty insurance industry. On a relative basis insurers rated B+/very good generally have demonstrated a very good ability to meet policyholder and other contractual obligations. *Best's* defines A as: excellent—assigned to those companies which *Best's* finds to have achieved excellent overall performance when compared to the norms of the property/casualty insurance industry. On a relative basis, insurers rated A/excellent generally have demonstrated a strong ability to meet their respective policyholder and other contractual obligations. "Contingent" is assigned temporarily to a company when there has been a decline in performance, in its profitability, leverage, and/or liquidity, but the

decline has not been significant enough to warrant an actual reduction in the company's previously assigned rating.

Net worth is not defined in the Act nor is a formula or standard procedure prescribed for determining net worth.

Borman's introduced the testimony of David Simmons, a partner with Touche Ross & Co., as an expert witness. According to Simmons, the commonly accepted meaning of "net worth" is the balance sheet entry which shows recorded assets in excess of recorded liabilities. Defendant agrees with this definition.

Simmons testified that the net worth of a person or company may change radically from year to year based upon factors entirely within or outside their control. Factors within their control include, for example, a declaration of dividends, sale or acquisition of assets, leveraged buyout, restructuring of capital, changes in accounting practices, changes in tax reporting, revaluation of assets, etc. Factors outside their control include, for example, labor strike, market conditions, shortage of raw product, the economy, unanticipated loss, mandated changes in accounting methods, tax law changes, etc. According to Simmons, net worth is not determinative of the ability of an insured to absorb loss in the event of its insurer's insolvency.

Sullivan, the president of the risk management services company, agreed with Simmons, stating that there was no relationship between net worth and ability to absorb loss.

During the course of the testimony of Robert Epstein, General Counsel of Borman's, a comparison was made for the years 1984–1987, between the sales, total assets, and net worth of Borman's and those of Safeway Stores, identified as once the largest supermarket chain in the world. The following figures were offered as evidence:

| COMPANY | DATE | TOTAL ASSETS | SALES | NET WORTH |
|---------|------|-------------|-------|-----------|
| Borman's | 01/26/85 | 140,390,383 | 1,025,920,000 | 22,797,000 |
| Safeway | 12/29/84 | 4,537,229,000 | 19,642,201,000 | 1,469,023,000 |
| Borman's | 01/25/86 | 148,245,599 | 987,188,000 | 30,135,000 |
| Safeway | 12/28/85 | 4,840,611,000 | 19,650,542,000 | 1,622,614,000 |
| Borman's | 01/31/87 | 175,401,725 | 1,072,998,137 | 38,783,000 |
| Safeway | 01/03/87 | 7,443,877,000 | 20,311,480,000 | 2,902,000 |
| Borman's | 01/30/88 | 229,376,865 | 1,028,254,713 | 10,110,000 |
| Safeway | 01/02/88 | 4,917,479,000 | 18,301,625,000 | (461,827,000) |

According to both Epstein and Simmons, the decrease in the net worth of Safeway from $1,622,614,000 in December, 1985, to $2,902,000 in January, 1987, and a negative ($461,827,000) in January, 1988, was the result of a leveraged buyout and changes in accounting practices, and not a change in business conditions. Under the Act, Safeway, with many times the sales and assets of Borman's, would have its claims covered while Borman's would not. Simmons stated that the fact that Safeway's net worth was a negative ($461,827,000) as of January 2, 1988, did not mean that it could not absorb loss or that its ability to do so was less than Borman's, which at that time had a net worth of about $10 million. According to Simmons, change in net worth does not mean that a company has experienced a change in profitability or a change in its operations.

The testimony of defendant's accounting expert Julius Otten, a partner at Peat, Marwick, is consistent with Simmon's opinion in this respect. Otten described a company which the Association had found to be entitled to coverage under the Act in accordance with the Act's net worth provision. That company, as of its March 31 year-end, had a net worth over $6,400,000. In the ensuing year it had revenues of over $68,000,000 and an operating profit of over $3,200,000. Yet its net worth dropped from $6,400,000 to $700,000. This drop in net worth was not attributable to financial reverses but, rather, to the fact that the

company bought back its own stock and established an employee stock ownership trust. The difference in net worth was not related to the financial condition of the company or its ability to absorb loss.

Epstein testified that had Borman's changed its accounting method for inventory from LIFO to FIFO on November 5, 1988, a change that Borman's had seriously considered, its net worth as reflected on its balance sheet would have been a positive $15.8 million instead of a negative $870,-000, an increase of more than $16 million. Assuming Borman's insurance carrier were to become insolvent in 1989, Borman's could recover from the Association if it continued to use a LIFO accounting method for valuing inventory, but if it merely changed to a FIFO method, Borman's could not recover from the Association. This difference in net worth had nothing to do with the financial condition of Borman's or its ability to absorb loss.

Simmons testified that financial condition can only be assessed by understanding each of the elements of the financial statement. The assets of a company must be analyzed, i.e., a receivable's age bears upon its value, and the method of accounting for inventory bears upon its value. Assets must also be analyzed to determine whether they are tangible or intangible. Goodwill, an intangible asset, is allowed under Generally Accepted Accounting Principles (GAAP), but is not a liquid asset and could not be used to absorb an unexpected loss. Similarly, the liabilities must be analyzed. Loan agreements may restrict uses of cash or may require that the company maintain certain ratios, which if not maintained could result in default and foreclosure. There may be obligations to employees under a collective bargaining agreement which impact on the financial condition of the company. In order to assess the financial condition of a company, one must also understand the industry and trends affecting the industry.

Simmons also testified regarding a "typical" real estate venture where the value of the asset (e.g. office building) is reported at acquisition cost less depreciation, resulting in a reduction in its value over time even though the market value of the asset may be substantially increasing during the same period. The increase in market value is normally not reflected on the balance sheet while the depreciation is. In this example, while the business may be profitable and the market value of the office building substantially increasing, the net worth continues to decline.

Another "typical" example introduced by plaintiff related to ownership of a shopping center or hotel venture. Often the owner will form a management company to operate the facility and obtain the insurance. Since it is the operating company which is at risk, typically it will be the operating company which will be sued as a result of a loss. Since the operating company has little, if any, assets, it will be covered under the Act. This results even though there is usually an identity of ownership between the operating company and the owner of the shopping center or hotel, and such owner may have a net worth substantially in excess of the net worth limitation.

The Association's accounting expert, Julius Otten, agreed that the real estate example and the management company example are typical. Otten also agreed that net worth may be radically different depending on the method of reporting utilized (i.e. cash, accrual, or tax basis) or on factors totally within the control of the company (such as a repurchase of stock). He also agreed that net worth does not show profitability. Otten felt, however, that it is rational to use net worth alone as the indicator of ability to absorb loss because, while net worth may be an imperfect measurement resulting in real or perceived inequities, net worth is an indicator of capacity to absorb loss which is generally understood and easily determined.

The Association asserted that both insurance companies and banks are examples which support the Association's position that a company's net worth indicates its ability to absorb loss. These businesses are heavily regulated, however, and their financial statements are governed by statute. Further, the testimony of the witness-

es does not support the defendant's argument. For example, Otten, the Association's witness, testified that insurance companies typically prepare two financial statements—one conforming to statutory requirements and one prepared in accordance with GAAP. Otten stated that the net worth figure on the two statements, covering precisely the same period of time, could be radically different. This example, therefore, ultimately provides further support for plaintiff's position that net worth, standing alone, is not a valid indicator of a company's ability to absorb loss.

Plaintiff's witness, Simmons, also testified that the net worth figures for insurance companies and banks are without meaning in this context. According to Simmons, one would need to evaluate reinsurance, reserves, agents' balances, and other matters in assessing the financial condition of an insurance company. With respect to banks, one would need to know, among other things, the types of loans that the bank had issued and the types of assets owned. Sullivan also stated that he would not rely on the net worth of an insurance company to show its financial condition.

George Gottheimer, Jr., the Association's witness, has worked for or on behalf of insurance companies throughout his 35–year career. It is Gottheimer's opinion that "given the limited resources that are available, ... the institution of a net worth exclusion is a reasonable and rational one, and that the net worth in and of itself is not perhaps a perfect measurement of a persons wealth. I think it is one that is easily determinable, easy to administer, and it is probably the best measure of the ability of a person to absorb loss." When questioned by the court, Gottheimer stated that while the net worth figure may paint a certain picture, it could vary from day to day and it does not tell you about liquidity and collectibility of assets. When asked by the court whether one needs to look at things other than net worth in assessing financial condition, Gottheimer responded that net worth is easy to administer, and that that is why he believes the legislature adopted the net worth provision.

Jean Carlson, the deputy commissioner for policy at the Michigan Insurance Bureau, agreed in her testimony that the attractiveness of utilizing net worth is the ease in administration. When cross examined, Carlson admitted that she could tell nothing real about the financial condition of a company knowing only its net worth.

Gloria Freeland, claims manager for the Association, testified that her job would be more difficult if there were no net worth provision because there would be more claims.

James Lunstead, the controller for the Association, testified about the balance sheet of the Association from inception to September, 1988. Lunstead was asked whether, based on the Association's net worth, the Association would be able to cover claims in the event of another major insolvency. Lunstead responded that, just looking at net worth, one cannot get a true economic or financial picture.

In addition to claiming that an entity's net worth is indicative of its ability to absorb loss, the Association argues that those entities with a higher net worth can better analyze the financial condition of insurance companies. Defendant's expert, Gottheimer, testified that "wealthier persons" were in a better position to evaluate the financial condition of insurance companies because they can better review the financial statements or hire someone with the expertise to do so. Plaintiff disagrees, however, arguing that net worth is not related to the ability of an insured to predict the insolvency of its insurer.

As noted above, Ideal was rated by *Best's* as B+ in 1980, A in 1981–1982, contingent A in 1983, and was not in any way restricted by the Michigan Insurance Bureau (M.I.B.) until mid–1984. The M.I.B., which audited the financial statements of Ideal, determined that Ideal did not pose a danger to the public until mid–1984. Yet, by the end of that same year, Ideal was placed in rehabilitation and, in early 1985, Ideal was declared insolvent.

According to testimony at trial, insurance company financial statements are reviewed by *Best's* and by the M.I.B. Copies

of reports issued by *Best's* and state insurance regulators are available to all interested persons irrespective of net worth. Further, while large companies may have risk managers, no evidence was presented showing that these persons are better able than *Best's* or the state regulators to assess the future financial picture of an insurance company so as not to need the protection of the Guaranty Association. Plaintiff introduced exhibits showing that many large companies with net worths over the Act's limit have had insurance with companies which became insolvent.

The Association also argued that the fact that Borman's had a self-insured retention of $50,000 per occurrence indicates that Borman's is better able to absorb loss than is an entity which has first dollar insurance. However, defendant did not establish a direct relationship between net worth and the amount of self-insurance retention. Indeed, as Epstein and Sullivan pointed out, Borman's net worth in November of 1988 was $39 million less than what it was in January, 1987, while its self-insured retention had doubled to $100,000.

*Analysis*

It is plaintiff's position that section 500.-7925(3) of the Act, which denies reimbursement of claims filed by "... a person who has a net worth greater than 1/10th of 1% of the aggregate premiums written by member insurers in the state in the preceding calendar year," denies plaintiff's right to equal protection of the law, as guaranteed by the fourteenth amendment to the United States Constitution, and by article I, section 2, of the Michigan Constitution.

The parties agree that the net worth classification of section 500.7925(3) does not involve a fundamental right or suspect classification meriting "strict scrutiny" by the court. Rather, the legislation in question is economic in nature and, therefore, subject to the "rational basis" test. *See Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Application of the rational basis test requires an analysis of the purpose of the legislation in question, and a determination of whether the classification contained in that legislation bears a rational relationship to its purpose. *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934).[2]

The dispute between the parties centers on the constitutionality of the section 500.-7925(3) classification of persons entitled to recover under the Act, i.e., classification of persons based upon their net worth. The only evidence submitted to the court regarding the purpose of the net worth limitation was presented through the testimony of the Association's witness, Elijah Poxson. According to Poxson, the purpose of the net worth limitation was to allocate loss to those persons best able to absorb loss.[3] There was no evidence submitted to the contrary, and there was no real dispute between the parties regarding the purpose

---

**2.** Plaintiff asserts that the test to be applied under Article I, section 2, of the Michigan Constitution is whether the net worth exclusion bears a fair and substantial relationship to the object of the Act. *See Manistee Bank & Trust Co. v. McGowan*, 394 Mich. 655, 232 N.W.2d 636 (1975). This test and the rational basis test under the fourteenth amendment to the United States Constitution are virtually indistinguishable. Therefore, the court will confine its discussion in the text to the rational basis test under the United States Constitution, and the court's conclusions shall apply with equal force to plaintiff's arguments regarding its right to equal protection under the Michigan Constitution.

**3.** Plaintiff asserts that the purpose of the Act is "to protect from potentially catastrophic loss persons who have a right to rely on the exist-

ence of an insurance policy...." *Metry v. Michigan Property & Casualty Guarantee Ass'n*, 403 Mich. 117, 121, 267 N.W.2d 695 (1978). In making this statement, the *Metry* court was drawing a distinction between insureds, whom the Act was designed in general to protect, and law firms seeking reimbursement under the Act for fees incurred in providing legal services to insolvent insurers prior to insolvency. The *Metry* court ultimately concluded that the fees sought for legal services were not "covered claims" within the meaning of the Act.

In the instant case, the plaintiff is challenging specifically the net worth provision set forth in section 500.7925(3) of the Act. Therefore, it is the purpose of section 500.7925(3) which is relevant to this dispute, and the court finds the purpose to be one which is consistent with the overall purpose of the Act as described in *Metry*.

of section 500.7925(3) or the legitimacy of this purpose. Rather, the arguments and proofs submitted by the parties centered upon their respective attempts to negate or to support the existence of any rational relationship between one's net worth and ability to absorb loss.

In challenging the constitutionality of section 500.7925(3), plaintiff has the heavy burden of convincing the court that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979), (citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). Further, "[a]lthough parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, ... they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (citation and footnote omitted) quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). However, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258 (citing *Zobel v. Williams*, 457 U.S. 55, 61–63, 102 S.Ct. 2309, 2313–14, 72 L.Ed.2d 672 (1982) and *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 535, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973)).

Conflicting testimony was introduced at trial. For example, defendant's accounting expert, Julius Otten, testified that, in his opinion, it is rational to use net worth alone as the indicator of ability to absorb loss. According to Otten, although net worth may be an imperfect measurement resulting in real or perceived inequities, net worth is a generally understood and easily determined indicator of capacity to absorb loss. In contrast, according to the testimony of plaintiff's accounting expert, David Simmons, net worth is not an indicator of the ability of an insured to absorb loss. In light of this and other conflicting evidence introduced at trial, defendant argues that the rationality of the relationship between a person's net worth and that person's ability to absorb loss "is at least debatable," and therefore passes the rational basis test. *Clover Leaf.*

Plaintiff, on the other hand, interprets the evidence to show that the relationship between net worth and ability to absorb loss "is so attenuated as to render the distinction arbitrary and irrational." *Cleburne.* In support of its argument, plaintiff points to the uncontroverted evidence regarding: 1) the "typical" real estate venture where the value of the asset (e.g., office building) is reported at acquisition cost less depreciation, resulting in a reduction in the asset's value over time even though the market value of the asset may be substantially increasing during the same period; 2) the "typical" shopping center or hotel venture where a management company is formed to operate the facility and obtain insurance, and where that management company meets the Act's net worth limitation despite the identity of ownership between the management company and the owner of the shopping center or hotel, which may not meet the Act's net worth limitation; 3) the extreme decrease in the net worth of Safeway Stores, Inc., occurring over the three year period from December, 1984, to January, 1988, as the result of a leveraged buyout and changes in accounting practices, and not as the result of a change in business conditions or the ability of Safeway to absorb loss; 4) the fact that a person's net worth may change radically from year to year based upon factors entirely within their control (i.e., declaration of dividends, sale or acquisition of assets, leveraged buyout, restructuring of capital, changes in accounting practices, changes in tax reporting, revaluation of assets, etc.) and/or upon factors entirely outside their control (i.e., labor strike, market conditions, shortage of raw product, the economy, unanticipated loss, mandated

changes in accounting methods, tax law changes, etc.); and 5) the fact that a single company at any fixed point in time can have a dramatically different net worth based merely upon, for example, a change in its accounting method for inventory from LIFO to FIFO.

■ After careful consideration of the pleadings submitted, the proofs introduced at trial, the parties' arguments heard in open court, and the law relating to this issue, the court agrees with the plaintiff's position and finds that the classification of persons and entities entitled to recover from the Association, based solely upon their net worth at a given time, is arbitrary and is not a classification which is rationally related to the Michigan legislature's purpose of allocating loss to those best able to absorb loss. The court is also satisfied, with regard to the defendant's alternative or supporting argument, that plaintiff has shown that there is no meaningful relationship between net worth and the ability of a person or entity to predict the insolvency of an insurer.

The court therefore concludes that section 500.7925(3), as it applied to plaintiff, violates plaintiff's right to equal protection under the law as provided by both the United States and Michigan Constitutions. Defendant is ordered to pay and discharge the claim filed by plaintiff which arose out of the slip and fall accident involving Norris Frye.

*Nonretroactivity*

In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court enunciated three separate factors to be considered in determining whether a judicial decision should be applied nonretroactively.

[I]n the last few decades, we have recognized the doctrine of nonretroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases. *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231; *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; *England v. State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440; *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329. In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, *see e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., supra,* 392 U.S. at 496, 88 S.Ct., at 2233, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, *see, e.g., Allen v. State Board of Elections, supra,* 393 U.S., at 572, 89 S.Ct., at 835. Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra,* 381 U.S., [618] at 629, 85 S.Ct. [1731] at 1738[, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma, supra,* 395 U.S., at 706, 89 S.Ct., at 1900.

*Id.* at 107–108, 92 S.Ct. at 356.

■ An equal protection challenge to an insurance act provision which determines eligibility for reimbursement of claims based on net worth, has not, to this court's knowledge, previously been litigated. Nor was the resolution of this matter clearly foreshadowed by prior court decisions. Also, the purpose of the Act's net worth provision, *i.e.,* to shift loss to those best able to absorb loss, would not be furthered by retroactive application of this court's ruling since it is unclear under the net

worth criterion whether those who have previously been denied reimbursement were or were not "best able to absorb loss." Finally, retroactive application of this court's decision could produce substantial inequitable results because insureds were on notice that the Act contained its net worth restriction, and the Association would likely suffer a severe depletion of its funds if it was now forced to reimburse each claimant who had previously been denied reimbursement under the Act on the basis of that claimant's net worth. Accordingly, the court's ruling in this matter shall be applied prospectively. *Accord DiFranco v. Pickard*, 427 Mich. 32, 75, 398 N.W.2d 896 (1986).

IT IS SO ORDERED.